**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SIRIUS COMPUTER** | ) | |
| **SOLUTIONS, INC.,** | ) | |
| **a Texas Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:20-cv-01432** |
| | ) | **Hon. Sharon Johnson Coleman** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN SACHS,** | ) | |
| **Defendant.** | ) | |

**FIRST AMENDED VERIFIED COMPLAINT
FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Sirius Computer Solutions, Inc. ("Sirius"), a Texas corporation, by and through its attorneys, SmithAmundsen LLC, states as follows for its First Amended Verified Complaint for Injunctive and Other Relief against Defendant, John Sachs ("Sachs"):

**<u>INTRODUCTION</u>**

Sachs is a senior sales representative who has spent 16 years at Sirius and its predecessor, developing business in the close-knit Carolinas IT space. Sachs relies heavily on company-funded client entertainment to turn client contacts into what Sachs describes as "buddies." In January 2020, Sachs breached his reasonable restrictive covenants by taking a position at Presidio, Sirius' direct competitor, doing the same thing, in the same territory. (EX A, ¶ 1(a).)

In addition, Sachs breached his non-disclosure obligations. Before hiring Sachs, Presidio had not had a major presence in the Carolinas. Based on documents Sachs produced in this litigation, Sirius now knows that Presidio and Sachs are making what Sachs describes as a "major push" in the Carolinas. During the interview process, and to show his value to Presidio, Sachs disclosed Confidential Information regarding Sirius' top accounts in the Carolinas and the

key players at each account, which include some of the "buddies" that are the backbone of Sachs' business development technique. This was non-public, competitively sensitive information that would have taken time to develop by proper means. Sachs should not have disclosed it to a competitor. His Agreement prohibits him, during his employment and for two years after, from disclosing information about his "customers and prospects," including information on "personnel." (EX A, ¶ 2.) Shortly after providing this information to Presidio, Sachs received a written offer of employment.

Still further, after starting the job with Presidio, Sachs immediately started meeting with his "buddies," wining and dining them just like he did when he was with Sirius, and only stopped when Sirius obtained a Temporary Restraining Order. Since then, Sirius has uncovered additional breaches including a July 2020 meeting between Presidio and one of the Sirius accounts that Sachs identified to Presidio. Notably, Sachs was included on the electronic invite for the meeting and then was removed at the last minute. There are surely more such incidents but the documents reflecting Sachs' activities are in the custody of Presidio and Presidio has not produced them despite being under subpoena to do so. The foregoing is what Sirius has been able to discover through its own investigation and the very limited information Sachs has provided.

Sachs' contract prohibits him for a year from taking action to induce or encourage customers to modify or terminate their relationship with Sirius. (EX A, ¶ 1(c).) Meeting with his "buddies" and others at large IT accounts is what Sachs does to encourage clients to give him business. These meetings are part of the "major push" Sachs was hired to help Presidio make in the Carolinas. The goal is to transfer as much of Sachs' book of business as possible from Sirius to Presidio. It unlikely is just a coincidence that, after these meetings occurred, Presidio sent a

team to meet with one of the accounts Sachs had identified to Presidio, and that Sachs was on the invite list and then taken off at the last minute. By meeting with his Sirius customer contacts, Sachs is encouraging them to give business to Presidio, at the expense of Sirius, which at a minimum would "modify" their relationship with Sirius in violation of Par. 1(c) of Sachs' Agreement.

Sachs knew that Sirius would sue him for what he planned to do, and had demanded before accepting the offer a commitment from Presidio to pay his legal fees. Although Sirius has not yet lost an account, the Agreement does not require that. Sachs' directly competitive position in the territory he worked for 16 years, the Confidential Information disclosures, and the on-going efforts to encourage clients and "buddies" to give work to Presidio that otherwise would have gone to Sirius, are all breaches of the contract.

## PARTIES

1.      Plaintiff, Sirius Computer Solutions, Inc. ("Sirius"), is a Texas corporation whose principal place of business is located in San Antonio, Texas. Sirius is an information technology ("IT") solutions provider for business enterprises throughout the entire United States.

2.      Defendant, John Sachs ("Sachs"), is a resident of the State of North Carolina who, on information and belief, resides in the greater Charlotte, North Carolina area.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to the contract between the parties (EX A hereto), Sirius is entitled to recover its attorney's fees and expenses, which exceed $75,000, exclusive of interest and costs.

4.     Venue is proper in this Court because the parties contractually agreed that jurisdiction and venue would lie solely with the federal or state courts located in Cook County, Illinois.  (*See* EX A hereto, ¶ 6.3.)

## THE INFORMATION TECHNOLOGY INTEGRATION BUSINESS

5.     Forsythe Technology, Inc. ("Forsythe") was an IT solutions provider that, like Sirius, sold technology-based business solutions to business enterprises.  Forsythe was based in Skokie, Illinois and did business throughout the entire United States.

6.     Information technology providers architect information technology solutions for business enterprises.  They sell hardware and software products, and professional IT consulting services designed to implement IT products and optimize a business entity's IT environment.

7.     As an IT solutions provider, Sirius offers customers solutions to complex, mission-critical IT challenges.

8.     Frequently, Sirius designs, implements and manages IT solutions for its clients that involve highly sensitive information such as financial, personal, and medical data.

9.     Sirius' projects are frequently millions of dollars in value.

## SIRIUS' PROTECTABLE INTERESTS

## SIRIUS' INVESTMENTS TO SUPPORT ITS SALES REPRESENTATIVES AND DEVELOP NEAR PERMANENT CUSTOMER RELATIONSHIPS

10.     Typically, in the IT solutions business, it takes a sales representative several years to develop a large client relationship.

11.     Sirius makes substantial investments both before and during the business relationship to assist the sales representative.  Working to identify, sell and maintain a client relationship is truly a team effort.  The investments Sirius makes include the following:

a. **Expense reimbursement**. Sirius reimburses its sales representatives for all of their travel, entertainment and the like in connection with their business development efforts. In 2019, Sachs had approximately $30,000.00 in such reimbursements, an unusually high amount. Sachs' business development efforts were substantially based on client entertainment such as sporting events, meals, drinks, and other social activities. It is not uncommon in the industry to minimize, or even avoid completely, the discussion of business during such client entertainment events. Nevertheless, they were business development activities which Sachs aggressively pursued, and which Sirius funded, because they were part of the overall effort to develop and strengthen the client relationship. Attached hereto are summaries of Sachs' expense reports for 2018 and 2019. (*See* EX B (Sachs' expense reports listed chronologically) and EX C (Sachs' expense reports grouped by customer)).

b. **Pre-Sales Engineering Consulting Services**. For prospective customers, Sirius pays for technical engineers, known as "pre-sales engineers," to support the sales representative. The pre-sales engineers assist the sales representative in designing the solution for the customer and often attend meetings to assist the sales representative to bring in the business. Sirius invests millions of dollars each year for its technical sales support engineers to perform these professional services for the benefit of Sirius' sales representatives. The expenditures for the pre-sale engineers are not billed to the client. This is an investment made by Sirius for business development purposes which benefits the sales representative.

c. **Contract Drafting**. Sirius' contracts with its customers are complex. Sirius invests substantial resources drafting its contracts and addressing legal issues with

counsel.  Sales representatives such as Defendant Sachs benefit from that work, which must be done, and those expenses, which must be incurred, in order for the sales representative to move forward with the relationship.

       d.    **Subject Matter Experts.**  Sirius supports its sales representatives by providing its clients with the professional services of in-house subject matter experts on an as-needed basis.  Sirius pays to interview, hire, and employ information technology engineers who are available to assist the sales representative service his or her clients.

       e.    **Contract Mining and Refreshing Team.**  Sirius employs a team of people that review customer contracts on an on-going basis for items such as contract expirations which provide new business and selling opportunities.  This team "mines" contracts to identify business development opportunities for the sales representatives.  This team alerts the sales representative when technology needs to be "refreshed" (*i.e.,* replaced with the newer version) or when maintenance is required.  This team provides the sales representatives with ideas for new business.  Sirius incurs the costs for these employees in this function in order to support the sales representative.

       f.    **Staff to Implement Statements of Work**.  Sirius employs "post-sales" engineers to implement the IT solutions sold to its clients.  Sirius' post-sales engineers are highly-skilled IT professionals with years of experience.  The talent and expertise of Sirius' post-sales engineers are a significant factor in a sales representative's ability to maintain a long-term client relationship.

       g.    **Back Office Support.**  Sirius supports its sales representatives with a full complement of back office operations.  Sirius' back office and administrative personnel prepare quotes, statements of work, invoices, provide accounting services, and perform

other administrative functions that sales representatives such as Defendant Sachs use for their accounts.

12. Comparable categories of investments were also made by Forsythe during the years that Sachs worked with Forsythe.

**SIRIUS HAS NEAR-PERMANENT RELATIONSHIPS WITH ITS CUSTOMERS**

13. Due to the complexity and sophistication of the products and services Sirius provides, the sensitivity of the business operations and data with which Sirius is entrusted, and the time and money Sirius invests to support its sales representatives' efforts to develop and maintain relationships, Sirius develops a high level of trust and loyalty with its clients.

14. As discussed above, acquiring an IT integration client is a difficult task that takes multiple years and substantial expenditures of resources.

15. Once Sirius has established a relationship with a client, Sirius usually receives repeat business for many years.

16. Once Sirius has established a relationship with a client with respect to a given aspect of its IT environment, the customer usually works exclusively with Sirius for that aspect of its IT environment and does not utilize other IT solutions providers to service that need.

17. It is not uncommon for Sirius' relationships with its clients to last ten years or more.

18. Typically, with a large account, Sirius' sales representative will be in frequent personal contact with the customer and will learn a great deal of information about the client and its business. In addition, many Sirius sales representatives, like Sachs, engage in frequent social activities with the customer such as meals, drinks, golf, and sporting events. Sirius refers to this as a "high touch situation." Furthermore, most of the new business a sales representative

generates is from "drilling down" into an existing customer, meaning learning its needs and finding other ways in which Sirius can be of assistance. This, too underscores the long term, near-permanent nature of the relationship and the extremely high degree of personal attention and contact that a Sirius sales representative is required to have with a large client.

19.     Typically, when a sales representative leaves Sirius, it takes roughly one year for a new Sirius sales representative to solidify the relationship.

20.     With respect to Defendant Sachs, most of his accounts have been with Sirius and Forsythe for at least five years. The foregoing features of customer relationships also applied to the relationships that Sachs developed during his tenure with Forsythe.

### SIRIUS' PROTECTABLE INTEREST IN CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

21.     Sirius maintains numerous categories of confidential and proprietary information that would provide a competitor with an unfair advantage were the information used by or disclosed to the competitor. This includes the following;

a.  **Salesforce Database**. Salesforce is a password-protected database with comprehensive information about Sirius' client accounts. Sirius only grants access to Salesforce to Sirius' sales representatives and others on a need-to-know basis. As a Senior Client Executive, Defendant Sachs had full access to Sirius' Salesforce database. The Salesforce database contains extensive confidential, and competitively sensitive information including:

i.  **Confidential quotes and proposals to customers**. Sirius' quotes and proposals to its customers are marked "confidential" and are not to be shared with anyone outside of the end user customer. At the time of his resignation, Sachs was in active business discussions with

many of his major clients regarding additional products and services he was attempting to sell to them.

    ii. **Sirius' pricing**. Sachs knows how Sirius prices its deals. Sachs is aware of mandatory markups that Sirius provides on its professional services. Sachs is also aware of Sirius' relationships with its manufacturers and partners, including discount percentages Sirius is able obtain. This is confidential information and it is extremely valuable to a competitor.

b. **Information on key employees at clients**. Sachs knows the identity of key information technology employees at the customers along with notes regarding their preferences, history with Sirius, responsibilities within the company, whether they can make decisions on purchases, and other valuable information that is not publically available and requires the expenditure of resources to develop. Although the identity of certain employees at customers may be publicly known through LinkedIn or similar sources, their importance to business development at the client is not publicly-known to Sirius' competitors or others who could benefit from its disclosure or use. Identifying the key employees, developing information about the client's needs, and building a relationship, requires the sales representative and Sirius to invest time and money.

c. **Information on key employees at Sirius**. Sachs also knows the identity of Sirius employees who are placed "in house" at the customer and the types of services those employees are providing or will be providing in the future.

This information is not publicly known to Sirius' competitors or others who could benefit from its disclosure or use. This information required an investment of time and resources to develop.

d. **Expiration dates for hardware leases, software subscriptions, and IT maintenance cycles**. Knowing when a customer will need to renew equipment leases and software subscriptions, or when maintenance support on such equipment will expire provides a sales representative with opportunities to approach the customer for new products or services. Sachs knows this information. This information is not publicly known to Sirius' competitors or others who could benefit from its disclosure or use. This information would require an investment of time and resources to develop by proper means. Although Sachs, like most Sirius sales representatives, frequently knew when software or hardware at their customers was due for renewal or replacement with current versions (known as "refreshing"), Sirius also employed a team of people that monitored these dates and kept Sachs and other sales representatives apprised of them, so that the sales representative could take advantage of the opportunities.

e. **Other confidential information regarding Sachs' accounts.** Sachs also maintained and continually updated detailed notes containing confidential and proprietary information about his business development efforts with actual and potential clients. Sachs referred to these notes as his "To-Do List" or "TTD." All of the information in the To-Do list was developed

during the course of his paid duties as a Sirius Senior Client Executive. The competitively valuable information in the To-Do List included:

    i. products and services that his customers might need;

    ii. the timelines for potential projects including what projects were in the clients' budget;

    iii. the identity of key players at the clients and information that would help him pursue them and develop business;

    iv. the results of phone calls and meetings;

    v. business development strategy;

    vi. expiration dates for leases; and

    vii. other information he was paid to develop and which he maintained because it was valuable to his effort to develop business.

22. A copy of Sachs' To-Do List as it existed at the time of his employment with Sirius terminated is attached hereto as Exhibit D.

23. The foregoing categories of information are not publicly-known nor are they known to competitors who could benefit from the information's disclosure or use. They are not generally known or available in the industry. Sirius' confidential business information such as lease expirations and information on a client's IT needs, although not subject to a bright line rule, is generally still useful after a period of two years, and sometimes for longer than that.

24. The foregoing categories of information took time and resources to develop. A competitor would unfairly benefit from having the information disclosed to them because it would unjustly avoid having to expend the time and resources to develop it by proper means.

25. Forsythe maintained comparable categories of confidential and proprietary information and Sachs developed, maintained, and had access to such information during his tenure with Forsythe.

26. In addition to limiting access through password protection as discussed above, Sirius uses agreements with confidentiality provisions to protect its confidential information (see discussion below).

27. Sirius' Employee Handbook includes provisions and policies that require employees to maintain the confidentiality of Sirius' business information.

28. In certain cases, such as with proposals and quotes, Sirius labels information provided to its end user customers as "confidential."

29. Sirius also requires employees to return confidential information in their possession to Sirius in connection with the termination of their employment.

30. Sachs was subject to similar restrictions on the use of confidential business information during his employment with Forsythe.

### **SIRIUS' PROTECTABLE INTEREST IN EMPLOYEE TRAINING**

31. As an IT solutions provider, it is imperative that Sirius' employees receive training on an on-going basis. Sirius invests substantial resources in on-going employee training.

32. Sirius hosts an annual Sales Kick-Off Meeting in February. The entire sales team is flown in for the event (which is generally held in San Antonio or Dallas), put up in hotels, and required to attend meetings for four to five days. The Sales Kick-Off provides sales representatives with the vision, goals, areas of focus, and specific training for the year. This is an enormous expense Sirius incurs to support its sales representatives.

33.     Sirius also has regional meetings each year to build team cohesion, support its sales representatives, provide knowledge on the latest products and services, and the like.  These expenditures benefit the sales representatives and they are incurred by Sirius exclusively.

34.     On at least a monthly basis, Sirius requires its employees to undergo in-house training.  Some of this training takes the form of "brain sharks," which are instructional videos. Sirius' sales representatives are also required to obtain certifications in a variety of IT-related technologies on an on-going basis in order to remain knowledgeable regarding ever-changing IT technology.

35.     Sirius' "brain shark" videos are either created in-house by Sirius employees or procured from outside vendors, all at no cost to Sirius' sales representatives.

36.     The aforementioned training is necessary because it is critical that Sirius be on the forefront of the technology that it is selling.  The training is mandatory and it requires significant expenditures of resources.

37.     Sachs was paid, in part, to participate in the aforementioned training.  Sirius employees that support his sales efforts and service his clients also were paid to attend the training.

38.     During his tenure at Forsythe, Sachs benefitted from comparable training and support.

## SACHS' NON-COMPETITION, CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENT

39.     In order to protect its interests in its near permanent customer relationships, confidential, proprietary and trade secret information, and training, Sirius (and Forsythe before it) requires its employees to enter into contracts containing reasonable restrictions on conduct that could harm Sirius' protectable interests.

40.     Defendant Sachs joined Forsythe as a sales representative in 2004.  At all relevant times, his business has focused on customers in the geographic region of the Carolinas.

41.     When he joined Forsythe, Sachs agreed to the terms of a contract entitled "Non-Competition, Confidentiality and Proprietary Rights Agreement" ("Agreement").

42.     Exhibit A hereto is a true and correct copy of the Agreement that Sachs signed.

43.     The Agreement provides that it was "made and entered into as of December 9, 2004." (EX A, p. 1.)  Sachs signed the Agreement on or about December 13, 2004.  (*Id.* at p. 5.)

44.     Pursuant to Paragraph 1 of the Agreement ("Non-Competition and Related Covenants"), Sachs agreed that, during his employment and for a period of twelve months thereafter, he would not:

> (a)     perform duties within the United States as or for a competitor of the Affiliated Group (i) which are the same or substantially similar to the duties performed by the Employee at any time during the 12-month period preceding Employee's termination or (ii) which involve the use of any Confidential Information (as defined below) which the Employee has received, obtained or acquired during, or as a consequence of, his/her employment with the Company;

> (b)     perform duties for (i) any current customer of the Affiliated Group (A) that Employee provided direct services to or (B) about which, by the nature of Employee's duties with the Company, Employee possesses significant information regarding such customer's operations or relationship with the Company or any other member of the Affiliated Group or (ii) any prospective customer of the Affiliated Group with which any member of the Affiliated Group was in active business discussions or negotiations at any time during the 6-month period preceding Employee's termination about which, by the nature of Employee's duties with the Company, Employee possesses significant information regarding such Customer's operations or proposed relationship with such member of the Affiliated Group;

> (c)     participate in the inducement or otherwise encourage any employees, customers or vendors or any member [of] the Affiliated Group to breach, modify or terminate any agreement or relationship that they have with any member of the Affiliated Group;

(*Id.*, ¶ 1 (a), (b), (c).)[1]

---

[1] Sirius does not seek to enjoin Sachs from working throughout the entire United States.  Rather Sirius seeks to enforce Paragraph 1(a) of the Agreement as to Sachs' actual geographic area of operations, which is the Carolinas. *See* Prayer for Relief, *below*.

45.     Pursuant to the Agreement, Sachs agreed to the following restriction with respect

to the non-disclosure of Confidential Information:

2.     <u>NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.</u>

a.     Employee will not at any time during his/her employment with the Company
and for a period of 2 years thereafter (other than as may be required or appropriate directly in
connection with the performance by him of his duties as an employee of the Company),
directly or Indirectly, use, communicate, disclose or disseminate any Confidential Information
(as defined below) in any manner whatsoever (except as may be required under legal process
by subpoena or other court order).  In the event disclosure of any Confidential Information is
required of Employee pursuant to the requirements of a government agency, regulation, judicial
order or by operation of law, Employee, within seven days of the request to make such
disclosure, and prior to Employee's response, shall give written notice to the Company as
provided in Section 6.7 herein.

b.     For purposes of this Agreement, "Confidential Information" shall mean any
and all Information (oral or written), not generally known or available to the trade or
industry without restriction, relating to the Company, any other member of the Affiliated
Group or any person controlling, controlled by, or under common control with the Company
or any other member of the Affiliated Group or any of its activities, including, but not
limited to, information relating to: technology, engineering, research, and/or development
activities and information; processes, methods, personnel; data processing (including, but
not limited to, software, programming design and development materials, documentation,
and hardware and data base information); financial information; products; identity and
description of materials and services used; purchasing; costs and pricing; customers and
prospects; advertising, promotion and marketing; as well as information provided by any
third party to the Company or any other member of the Affiliated Group.

(*Id.*, ¶ 2(a),(b).)

46.     Pursuant to the Agreement, Sachs agreed as follows with respect to remedies for

breach:

4.     <u>REMEDIES</u>. The Company and Employee hereby agree that it is impossible to
measure solely in money the damages which will accrue to the Company by reason of
Employee's failure to observe any of Employee's obligations under this Agreement.
Therefore, if the Company shall institute any action or proceeding to enforce such
obligations or provisions, Employee hereby waives the claim or defense that there is an
adequate remedy at law and agrees in any such action or proceeding not to interpose the
claim or defense that such remedy exists at law. Without limiting any other remedies that
may be available to the Company, Employee hereby specifically affirms the
appropriateness of injunctive or other equitable relief in any such action. Any costs and

expenses (including reasonable attorneys' fees and costs) incurred by the Company in enforcing any provision of this Agreement shall be borne by Employee.

(*Id.*, ¶ 4.)

47.     Pursuant to the Agreement, Sachs agreed upon termination of his employment to return all materials related to his employment, including any materials containing Confidential Information:

> a.     Upon the termination of Employee's employment with the Company for any reason, Employee will promptly deliver to a designated Company representative all property of the Company in possession of Employee and all writings, records, data, memorandum, contracts, orders, sales literature, price lists, client lists, data processing materials, and other documents whether or not obtained from the Company, which pertain to or were used by Employee in connection with his employment by the Company, including, but not limited to, Confidential Information.

(*Id.*, ¶ 5(a).)

48.     Pursuant to the Agreement, Sachs agreed as follows with respect to the partial invalidity of any provision:

> 6.1     <u>Partial Invalidity</u>. Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be modified, restricted, or omitted to the extent, but only to the extent, of such invalidity, illegality or unenforceability to make this Agreement enforceable, without invalidating the remainder of such provision or provisions or any other provisions of this Agreement, unless such a construction would be unreasonable. If any provision is held invalid or unenforceable with respect to particular circumstances, it nevertheless shall remain in full force and effect in all other circumstances.

(*Id.*, ¶ 6.1.)

49.     Pursuant to the Agreement, Sachs agreed as follows with respect to the reasonableness of the restrictions:

> 6.2     <u>Reasonable Limitations</u>. The parties hereto stipulate and agree that each of the terms of this Agreement including, but not limited to, the scope of the activities prohibited and the time limitation is reasonable.  The parties further stipulate and agree that in the event a court determines contrary to the agreement of the parties herein that any of the terms of this Agreement are unreasonable or contrary to public policy, or invalid or unenforceable for

any reason in fact, law, or equity, then the court shall limit application of any such provision or term or modify any provision or term to that which it finds reasonable, valid, or enforceable and shall enforce this Agreement as so limited or modified.

(*Id.*, ¶ 6.2.)

50. Pursuant to the Agreement, Sachs agreed as follows with respect to governing law, jurisdiction and venue:

6.3 <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of Illinois. The parties agree that venue will lie solely with federal or state courts located in Cook County, Illinois and submit to the jurisdiction of federal or state courts located in Cook County, Illinois.

(*Id.*, ¶ 6.3.)

51. Pursuant to the Agreement, Sachs agreed as follows with respect to successors and assigns:

6.4 <u>Successors and Assigns</u>. This Agreement will inure to the benefit of, may be assigned and will be binding upon, the successors and assigns of the Company.

(*Id.*, ¶ 6.4.)

## SACHS WORKED AS A SALES REPRESENTATIVE AND ACCOUNT MANAGER FOR FORSYTHE FOR NEARLY THIRTEEN YEARS

52. Following his execution of the Agreement, Sachs worked at Forsythe as a sales representative until Sirius acquired Forsythe in October 2017. During his tenure with Forsythe, Sachs rose to the level of Senior Account Manager.

53. During his employment with Forsythe, Sachs was given access to, and was involved with the development and maintenance of, the Company's Confidential Information as defined in the Agreement, including without limitation information regarding the Company's finances, pricing, proposals and quotes, bidding strategies, profit margins, customer retention plans, customer contacts, customer needs and preferences, prospective customers, processes, methods and marketing strategies, and other categories identified herein.

54. During the course of his employment with Forsythe, Forsythe paid Sachs to obtain new customers, and to develop and maintain relationships with Forsythe's existing customers.

55. The customers with whom Sachs developed relationships were long-term, near-permanent relationships which lasted for multiple years and which resulted in repeat business.

56. During the course of his employment, Forsythe expended resources to support Sachs' customer development efforts, including reimbursing marketing expenses, providing back office and administrative support, and providing technical support, and providing the other forms of support described above.

57. Sachs developed personal goodwill with Forsythe's customers as a result of Forsythe's support of his business development efforts that Forsythe paid him to undertake.

## SIRIUS ACQUIRED FORSYTHE IN OCTOBER 2017

58. On October 31, 2017, Sirius acquired Forsythe in a stock purchase transaction.[2]

59. Attached hereto as EX E is a copy of the Certificate of Merger reflecting Sirius' acquisition and subsequent merger of Forsythe into Sirius.

60. Sirius is the successor-in-interest and/or assignee of Forsythe with respect to the Agreement, and is entitled to enforce it. (*See* EX A, ¶ 6(d).)

61. Following Sirius' acquisition of Forsythe, Sachs continued in a business development/sales role. By late 2018, Sachs had attained the title of Senior Client Executive at Sirius.

---

[2] Forsythe was owned by its employees through an employee stock ownership plan (ESOP). Sirius acquired ownership of Forsythe (and all of its subsidiaries) by purchasing all of the interests in the ESOP. Subsequent to its acquisition of Forsythe's ESOP interests, Sirius converted Forsythe to a limited liability company (December 2017) and then merged Forsythe into Sirius (May 2018).

62. Following Sirius' acquisition of Forsythe, Sachs continued to have access to, and to develop, Confidential Information as defined in the Agreement.

63. Following Sirius' acquisition of Forsythe, Sachs continued to develop and maintain the relationships with the customers he developed at Forsythe, and to develop new relationships, and received Company support in his efforts to do so. These included client entertainment, meals, drinks, sporting events and the like, including client get togethers that were entirely or primarily social.

64. Following Sirius' acquisition of Forsythe, Sachs continued to develop goodwill with the customers he worked with at Forsythe. Sirius supported his business development efforts and paid him to undertake the activities that allowed him to maintain and develop those customer relationships.

65. At Forsythe, and then with Sirius following the merger and continuing until Sachs resigned in January 2020, Sachs' established clients included the following companies:

        a. AG FIRST FARM CREDIT BANK
        b. AMERICAN INTERNATIONAL GROUP
        c. BLUE CROSS AND BLUE SHIELD SOUTH CAROLINA
        d. HARRIS TEETER
        e. SCANA SERVICES, INC. N/K/A DOMINION ENERGY SOUTHEAST
        f. TIAA CREF INDIVIDUAL & INSTITUTIONAL SERVICES, INC.
        g. TEACHERS INSURANCE & ANNUITY ASSOCIATION OF AMERICA
        h. THE KROGER COMPANY
        i. ELECTRIC POWER RESEARCH INSTITUTE
        j. KPS, LLC
        k. ALLY BANK
        l. NORTH STATE TECHNOLOGY SOLUTIONS
        m. HTPS, LLC
        n. BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA
        o. SOUTH CAROLINA ELECTRIC & GAS
        p. DATACHAMBERS, LLC
        q. ALERT LOGIC INC.
        r. ELECTROLUX NORTH AMERICA, INC.
        s. ON SEMICONDUCTOR CORPORATION
        t. SPX CORPORATION

u.  DASSAULT SYSTEMES AMERICAS CORP.
v.  SPX FLOW, INC.
w.  CSI LEASING, INC.

66.     All of the customers in the foregoing list were Sirius customers with whom Sachs worked beginning no later than 2015.  TIAA, Kroger, SCANA, and Ag First Bank have been customers of Sirius and Forsythe for at least six to seven years.  TIAA goes back to 2011.

67.     Sachs provided direct services to all of the foregoing companies.

68.     By the nature of Sachs' duties with Sirius and Forsythe, Sachs possesses significant information regarding the foregoing customers' operations or relationship with the Company.

69.     All of the customers in the foregoing list are current customers of Sirius.

70.     In addition, Sachs was in active business discussions or negotiations during the 6-month period preceding his resignation with the following prospective customers: Moody's, Ingersoll Rand, LPL Financial, and Transunion.  By nature of Sachs' duties with the Company, Sachs possesses significant information regarding these prospective customers' operations or proposed relationship with Sirius.

71.     But for his employment with Forsythe and Sirius, Sachs would not have had contact with these customers or developed relationships with them.

72.     In 2019, Sachs generated $1.586 million in gross profit from his sales efforts, which qualified him for Sirius' annual Summit trip.[3]

---

[3] Each year, Sirius (and Forsythe before it) awards its top sales representatives, technical resources, and back-office support employees with a four-to-five day trip to recognize their achievements.  The location of the trip will vary from locations in Hawaii, Mexico, and a variety of resorts in the continental United States.  The 2020 Summit trip was scheduled for late-April 2020.  Sachs, if he remained employed, would have been invited to attend the 2020 Summit.

**FROM OCTOBER 2019 THROUGH EARLY JANUARY 2020, SACHS INTERVIEWS WITH PRESIDIO AND DISCLOSES CONFIDENTIAL INFORMATION ABOUT HIS SIRIUS CLIENTS**

73.     Presidio is a direct competitor of Sirius.  Presidio is based in New York City, New York but operates throughout the United States, including the Carolinas.

74.     Prior to hiring Sachs, Presidio did not have a significant presence in the Carolinas outside of certain public sector clients.  Presidio's hire of Sachs was part of what Sachs described as a "major push" Presidio was making in the Carolinas market for IT integration services.  (*See* EX F hereto, 12/8/9 e-mails from Sachs to Presidio's Michael Kelly and Byron Vick.)

75.     In October 2019, Sachs contacted Presidio's Vice President of Sales, Michael Kelly,  regarding potential employment with Presidio.

76.     In late November or early December 2019, while still employed by Sirius, Sachs met with Presidio representatives including Peter Boettcher (Sales Vice President South East), Byron Vick (Sales Director), and Michael Kelly.

77.     On December 8, 2019, Sachs sent Presidio's Vick an e-mail with the subject line "Sachs 2010[4] and 2021 – Targets," which attached an Excel spreadsheet.  A copy of the e-mail and attachment is attached hereto as EX F.  Sachs also forwarded the spreadsheet to Presidio's Michael Kelly.  (*Id*.)

78.     In the spreadsheet that Sachs sent to Presidio's sales executives Kelly and Vick on December 8 2019, while Sachs was still employed by Sirius, Sachs disclosed to Presidio the names of five key accounts in the Carolinas.  (*Id*.)  This was not public knowledge.  On information and belief, Sachs had also disclosed this and other information to them during the discussions and meetings that occurred in October, November and early December, 2019.

---

[4] The reference to "2010" was a typographical error by Sachs, who meant "2020."

79. In the spreadsheet, Sachs also disclosed to Presidio's sales executives the identities of key contacts Sachs had developed at each of these accounts and included their title and in some cases a description of their duties. This also was not public knowledge.

80. Pursuant to Paragraph 2(b) of his Agreement, Sachs had agreed to not use or disclose any information regarding "customers and prospects." (EX A, ¶ 2(b).)

81. The combination of identifying these companies as key opportunities in the Carolinas, and also listing key contacts with whom Sachs had relationships, gave Presidio a road map for its "major push" into the Carolinas market. This was Confidential Information that Sachs developed as a Sirius employee.

82. In his December 8, 2019 e-mail to Presidio's Vick, Sachs disclosed that another account was an opportunity that could yield over $1 million in gross profit ("GPM") in 2020. (EX F at p. 1.) This, too, was Confidential Information that Sachs was contractually barred from using or disclosing except for the benefit of Sirius.

83. In his December 8, 2019 e-mail to Presidio's Kelly, Sachs stated as follows regarding Sachs' impending "partnership" with Presidio:

> . . . I'm getting pretty fired up about the prospects of this partnership. This is going to shake up the Carolinas. I like the timeframe of it happening on New Year's Day. The bomb, I mean the ball, will drop at midnight. HA. And between us, I cant [*sic*] think of a better way to tell the mfr's, and other VAR's, that Presidio is making a major push in the Carolinas. You know this IT community bro . . . its [*sic*] SO close knit and having been with Sirius/Forsythe for 16 years, it will make an impact. Hope that doesn't come across as cocky; I'm just thinking about it from a word of mouth perspective and the fact that I'm buddies with so many of these guys/gals, and customers. I've floated it past a couple of mfg partners I've known for a long time and their reaction was "holy sh**t, you're really leaving them." I'm going to personally take the responsibility of building the Presidio brand in the Carolinas. . . .

(*Id*.)

84. Among other things, Sachs' December 8, 2019 e-mail to Presidio's Kelly indicated that Sachs considered himself to be "buddies" with his customers based on his long

career at Forsythe/Sirius, and that leveraging his relationships with these "buddies" was a cornerstone of his business development plans for Presidio. As is discussed below, Sachs started meeting with his "buddies" almost immediately upon joining Presidio.

85.     In his December 8, 2019 e-mail to Vick, Sachs described the information contained in the spreadsheet as "the accounts, contracts and opps I see out there from day # 1." (*Id.*) Sachs only knew about these "opps," or opportunities, due to the activities in which he engaged as a Sirius sales representative. Sachs disclosed this information to Presidio because Sachs was trying to get a job and this information was valuable to Presidio, who was planning a "major push" into the Carolinas.

86.     Sachs' e-mail also indicated that, in anticipation of his new position at Presidio, Sachs was not working as hard as he normally would have at Sirius. Sachs stated: "I have a lot of availability this week (first time I've ever had time in December to breath) [*sic*] . . ." (*Id.* at SACHS 0000368.)

87.     Sachs also indicated that, once he received his offer letter from Presidio, he was going to spend his remaining time at Sirius setting up appointments for his first week at Presidio: " . . . I'd like to sit down and really dig into my plan of action from that moment [receipt of his offer letter] through my start date (1/13). There's a lot of things I can do to tee myself up, so I'm on the road on January 13th with a full day of meetings." (*Id.*)

88.     Tellingly, Presidio extended an offer to Sachs shortly after Sachs sent the December 8, 2019 e-mail. Sachs received his offer letter from Presidio on December 17, 2019. After receiving it, Sachs e-mailed Presidio Associate Recruiter, Jessica Muscarella, and stated: " . . . In reviewing this document, I do see one area this is missing. We verbally agreed to Presidio covering any/all legal expenses related to Sirius; as we are all confident Sirius will be taking

some legal action pertaining to the move I am making. Am I missing it in the document? Just let me know . . ." (EX G.) Muscarella replied: "Yes, Peter [Boettcher] did tell us that we would cover all expenses should Sirius take legal action. . . ." (*Id*.) Muscarella said that Mike Kelly and Peter Boettcher would follow up with Sachs so that he had a commitment in writing. (*Id*.) After receiving this assurance from Presidio, Sachs indicated that he would "sign the offer letter now, so we don't slow things down." (*Id*.)

### SACHS RESIGNS FROM SIRIUS AND STARTS MEETING WITH HIS SIRIUS CUSTOMERS AND ASSISTING PRESIDIO IN ITS EFFORTS TO DO SO.

89.     On Friday, January 10, 2020, Sachs met with his Sirius supervisors, Lauren Peterson and Jon Warren, at a restaurant in Charlotte, North Carolina. During the meeting, Sachs told them he was resigning and joining Presidio.

90.     During the meeting, Sirius' Peterson told Sachs that, if Sachs joined Presidio, Sirius would take legal action against Sachs for violations of the restrictive covenants in his Agreement. In response, Sachs said that Presidio had agreed to pay Sachs' legal fees in the event that Sirius sued Sachs.

91.     Although Sachs had worked for Sirius/Forsythe for fourteen years, in connection with his resignation Sachs did not return any information to Sirius, other than his company-issued laptop.

92.     During the meeting where Sachs resigned, Peterson and Warren requested that Sachs assist Sirius to transition his accounts to a new Sirius sales representative or representatives. Although Sachs initially agreed to do so, he never did.

93.     Sachs' first day at Presidio was January 13, 2020.

94. Consistent with Sachs' expressed desire to be "going 100 mph" as soon as he started with Presidio (*see* EX G at p. 2), Sachs immediately began business development on behalf of Presidio with companies that were customers or prospects of Sachs at Sirius.

95. On an unknown date in either January or February, 2020, Sachs had dinner with Kevin Singletary, IT Manager for SCANA Services, now known as "Dominion Energy Southeast" (referred to herein as "SCANA"). Singletary has awarded Sirius/Forsythe many projects over the years. SCANA has been a client of Sirius/Forsythe for at least five years.

96. During the proceedings on Sirius' Motion for Temporary Restraining Order, Sachs asserted that his dinner with Singletary was purely social and not related to business development. (ECF No. 13-1, Declaration of John Sachs, ¶ 29.) In fact, as discussed above, Sachs by his own admission considers his customers to be "buddies," and promoted his relationships with his "buddies" as a selling point to Presidio when he was seeking employment. (EX G.) Sachs met Singletary during the course of Sachs' business development activities for Sirus/Forsythe. Sachs took Singletary out for meals, drinks or other entertainment ***thirty-four times*** in 2019 alone, sometimes with just Singletary and sometimes with Singletary's colleagues at SCANA. (*See* EX C at pp 3-4.) Sachs' dinner with Singletary was business development for Presidio. It is part of an effort by Sachs to induce and encourage SCANA to modify or terminate its long-term business relationship with Sirius, in violation of Paragraph 1(c) of Sachs' Agreement with Sirius.

97. On January 16, 2020, Sachs e-mailed Tina Morettin from Checkpoint, a company that provides cyber security software. (EX H.) In the IT integration industry, resellers like Sirius and Presidio frequently team up with vendors like Checkpoint to "pitch" actual and prospective clients for business. In the e-mail, Sachs provided a list of twenty companies where

Sachs said he had close contacts and wanted to set up meetings. (*Id*.) On the list were several companies that were Sirius customers or prospective customers that Sachs had been actively pursuing while he was with Sirius:

    a.   **Moody's**: Moody's is a prospective Sirius account that Sachs was pursuing as recently as late October, 2019. (EX D at 5-6, 7-8.) Sachs' To-Do List contains non-public competitively useful Confidential Information Sachs developed during his efforts to develop business with Moody's on behalf of Sirius, including business opportunities and the identity of decision makers. (*Id*.)

    b. **Blue Cross Blue Shield of South Carolina ("BCBSSC")**: BCBSSC is a long-time client of Sirius/Forsythe and was Sachs' client for a period of time.

    c. **LPL Financial:** LPL Financial is a prospective Sirius account that Sachs was pursuing as recently as October, 2019. Sachs' To-Do List contains competitively useful Confidential Information Sachs developed during his efforts to develop business with LPL Financial on behalf of Sirius, including the identity of decision makers and products the company was currently using. (EX D at 5, 26.)

    d. **Ingersoll Rand:** Ingersoll Rand was a prospective Sirius customer. During 2019, Sachs worked extensively on business development at Ingersoll Rand. In his To-Do List, Sachs has approximately two and one half pages of non-public competitively useful business development notes for Ingersoll Rand,

including projects under consideration, budgeting, key players for different opportunities, and the like. (EX D at 25-28.)

98. On February 4, 2020, Sachs e-mailed Richard Rhodes, Manager of Cyber Security Operations at Blue Cross Blue Shield of South Carolina ("BCBSSC"). (EX I hereto.) BCBSSC is a long-term client of Sirius. Sachs set up a lunch for February 10, 2020, and also invited Jeff Comer, Security Practice Lead at Presidio in South Carolina. (*Id*.) This lunch was business development for Presidio. It is part of an effort by Sachs to induce and encourage BCBSSC to modify or terminate its long-term business relationship with Sirius, in violation of Paragraph 1(c) of Sachs' Agreement with Sirius.

99. On February 21, 2020, Sachs had drinks with Ron Bradley of Ingersoll Rand. During the proceedings on Sirius' Motion for Temporary Restraining Order, Sachs asserted that his meeting with Bradley was "purely friendly" in nature. (ECF No. 13-1, Declaration of John Sachs, ¶ 32-33.) In fact, during 2019, Sachs worked extensively on business development at Ingersoll Rand. In his To-Do List, Sachs has approximately two and one half pages of business development notes for Ingersoll Rand including projects under consideration, budgeting, key players for different opportunities, and the like. (EX D hereto, pp. 25-28.) Sachs' meeting with Bradley and Ingersoll-Rand was business development for Presidio.

100. Sachs' get together with Ingersoll Rand's Bradley was supposed to have included another Ingersoll Rand representative, Jim Powell. (EX J hereto, text messages between Sachs and Bradley at SACHS 0000362 ("Invite Powell too.").) Jim Powell is the LSR Architecture and Development Manager at Ingersoll Rand in the Greensboro/Winston-Salem, North Carolina Area. When he was working for Sirius, Sachs had taken Powell out to dinner or drinks eight times in 2019. (EX C at p. 6.) Sachs' To-Do List has multiple references to Jim Powell in

connection with various opportunities Sachs was pursuing for Sirius. (EX D at pp. 26-28.) For this reason, too, Sachs' get together with Bradley, which was supposed to have also included Powell, was business development for Presidio.

101.    On February 25, 2020, Sachs attended a baseball game with Pedro Acosta of AgFirst, one of Sachs' Sirius accounts.

102.    During the proceedings on Sirius' Motion for Temporary Restraining Order in this case, Sachs asserted that his get together with Acosta at the baseball game was purely social. (ECF No. 13-1, Declaration of John Sachs, ¶ 29.) As with his claim regarding the Singletary dinner, this claim lacks credibility. Sachs met Acosta during the course of Sachs' business development activities for Sirius/Forsythe. Acosta was one of Sachs' "buddies" at his customers. These "buddies" are the backbone of Sachs' business development strategy in the "close knit" Carolinas IT market, as Sachs himself said to Presidio when he was seeking employment. (EX F.) Attending the baseball game with Acosta was business development for Presidio. It is part of an effort by Sachs to induce and encourage AgFirst to modify or terminate its long-term business relationship with Sirius, in violation of Paragraph 1(c) of Sachs' Agreement with Sirius.

103.    On or about July 28, 2020, a team from Presidio met with representatives of AgFirst. Sachs appeared on the electronic invite list for the meeting, but his name was removed at the last minute. While still employed by Sirius, Sachs had disclosed Confidential Information about AgFirst to Presidio. On information and belief, Sachs played a role in arranging this meeting for Presidio. It is part of an effort by Sachs, directly or indirectly through his Presidio colleagues, to induce and encourage AgFirst to modify or terminate its long-term business relationship with Sirius, in violation of Paragraph 1(c) of Sachs' Agreement with Sirius.

104.    Sachs' statement to Sirius during Sachs' exit interview that Presidio will pay his legal fees if Sirius sues Sachs to enforce the restrictive covenants indicates that Sachs intends to continue breaching the Agreement, including having business development meetings with other additional actual and prospective Sirius customers, regardless of his contractual obligations.

105.    At Presidio, Sachs has the same job, and is selling or assisting Presidio in its efforts to sell, the same or substantially similar products, to the many of the same customers, in the same geographic territory, in direct competition with Sirius.

106.    Sachs has already improperly used and disclosed Confidential Information in violation of the Agreement.  Given his duties for Presidio, and the customers they are targeting, he will continue to use and disclose Confidential Information which Sachs has received, obtained or acquired during, or as a consequence of, his employment with Sirius/Forsythe.

107.    Sachs cannot be trusted to refrain from using or disclosing the Confidential Information in his possession, as demonstrated by his incredible assertions that his business development meetings with clients were merely "friendly" get togethers.

108.    The fact that Presidio has already met with AgFirst, and that Sachs was initially included in the invite for the meeting, demonstrates that Sachs will also indirectly violate the Agreement by assisting his Presidio colleagues to do what he is contractually barred from doing.

109.    Sachs knows he is in breach as evidenced by his threat that his new employer intends to pay his legal fees if Sachs is sued.  Unless enjoined, he will call on additional actual and prospective Sirius customers.  He likely has called on customers other than those identified herein.

110.    Unless Sachs is enjoined, Sirius will suffer irreparable harm in that it will lose long-term, near permanent customer relationships and goodwill that it is entitled to protect.

111.    Unless Sachs is enjoined, Sirius will suffer irreparable harm in that it will be faced with unfair competition by a Senior Client Executive who possesses protected Confidential Information about Sirius' actual and prospective customers and is directly competing with Sirius.

## COUNT I:
## BREACH OF CONTRACT

112.    Sirius re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 111 above as if fully set forth herein.

113.    The Non-Competition, Confidentiality and Proprietary Rights Agreement is a valid and enforceable contract.

114.    Sirius has performed all obligations on its part to be performed pursuant to the contract.

115.    The restrictive covenants are reasonably tailored to protect Sirius' interests in its customer goodwill, near-permanent customer relationships, competitive position, Confidential Information, and employee training.

116.    Sachs is in flagrant, on-going breach of his obligations pursuant to the Agreement. Specifically:

a.  Presidio is a direct competitor of Sirius and Sachs' duties are the same or substantially similar to the duties performed by Sachs as a Senior Client Executive during the 12-month period preceding his resignation from Sirius, in violation of Paragraph 1(a) (i) of the Agreement.

b.  Presidio is a direct competitor of Sirius and Sachs is engaging in business development activities with actual and prospective Sirius customers about whom he possesses Confidential Information. Therefore, his duties for Presidio involve the use of Confidential Information that Sachs received, obtained, or acquired during or as a

consequence of, his employment with Sirius, in violation of Paragraph 1(a)(ii) of the Agreement.

c. Sachs is meeting with and communicating with his contacts at his former Sirius accounts, to induce and encourage them to give business to Presidio, and thereby modify or terminate their relationship with Sirius, in violation of Paragraph 1(c) of the Agreement.

d. Sachs is assisting his colleagues at Presidio in their efforts to develop business with Sachs' former Sirius clients such as AgFirst, in an effort to induce and encourage them to give business to Presidio, and thereby modify or terminate their relationship with Sirius, in violation of Paragraph 1(c) of the Agreement.

e. Sachs has disclosed Confidential Information to Presidio in violation of Paragraph 2 of the Agreement. This includes identifying business opportunities in the Carolinas and key contacts at major accounts, for the purpose of assisting Presidio in its "major push" to expand their business in the Carolinas in competition with Sirius.

f. Sachs has used Confidential Information by meeting and communicating with client contacts whose importance to business development is not publicly known and whom he identified during the course of his duties as a Sirius sales representative, in violation of Paragraph 2 of the Agreement.

g. On information and belief, Sachs has used Confidential Information contained in his To-Do List and developed through his sales representative duties at Sirius, for the purpose of business development on behalf of Presidio, in violation of Paragraph 2 of the Agreement.

h.  On information and belief, Sachs has disclosed to Presidio Confidential Information, including without limitation information contained in his To-Do List, and developed through his sales representative duties at Sirius, to assist Presidio in its "major push" to expand its business in the Carolinas, in violation of Paragraph 2 of the Agreement.

117.    Sachs also is engaged in conduct which, if not enjoined, will result in other breaches of the Agreement:

a.  Sachs is seeking to perform duties for current and prospective customers of Sirius, about which Sachs, by the nature of his duties with Sirius, possesses Confidential Information, and therefore Sachs is using, communicating, disclosing, or disseminating Confidential Information in violation of Paragraph 2(a) of the Agreement.

b.  Sachs is seeking to perform duties for current customers of Sirius, for whom Sachs previously performed direct services, in violation of Paragraph 1(b)(i)(A) of the Agreement.

c.  Sachs is seeking to perform duties for current customers of Sirius, about which Sachs, by the nature of his duties with Sirius, possesses significant information regarding the customer's operations or relationship with the Company, in violation of paragraph 1(b)(i)(B) of the Agreement.

d.  Sachs is seeking to perform duties for prospective customers of Sirius, with which Sachs or other employees of Sirius were in business discussions or negotiations during the six months preceding his resignation, and about which Sachs possesses significant information regarding such customer's

operations or proposed relationship with Sirius, in violation of Paragraph 1(b)(ii) of the Agreement.

118.     Sachs did not, upon the termination of his employment, return to Sirius all materials in his possession which pertain to or were used by him in connection with his employment, including materials containing Confidential Information, in breach of Paragraph 5(a) of the Agreement.  Because such materials were in Sachs' possession, Sirius cannot identify with specificity the materials that should have been returned.  However, it is not reasonable for Sachs, who had worked for Forsythe/Sirius since 2004, to not have a single paper or electronic document or communication in his possession at the time he resigned other than what was on his laptop.

119.     Sachs' violations of the Agreement are continuing and will continue until he is enjoined.

120.     Sachs' violations of the Agreement, if not enjoined, will cause Sirius imminent irreparable harm through the loss of customer goodwill, damage to Sirius' competitive position, and the use and disclosure of Confidential Information for the benefit of a direct competitor.

121.     Monetary damages are difficult to quantify and/or will not make Sirius whole.

122.     Sirius has no adequate remedy at law.

123.     The balance of harms favors Sirius and favors the grant of temporary, preliminary and permanent injunctive relief.

124.     The public interest favors Sirius and favors the grant of temporary, preliminary and permanent injunctive relief.

125. Pursuant to Paragraph 5 of the Agreement, Sachs specifically waived the claim or defense that there is an adequate remedy at law for breaches of the Agreement, and affirmed the appropriateness of injunctive relief.

126. Pursuant to Paragraph 5 of the Agreement, Sachs agreed to pay Sirius' costs and expenses, including reasonable attorney's fees, incurred in successfully enforcing any provision of the Agreement.

127. The 12 month period of restriction contained in Paragraph 1 of the Agreement should be extended for the period of time that Sachs is found to have been in breach, so that Sirius gets the benefit of the full 12 month period of restriction to which Sachs agreed.

## PRAYER FOR RELIEF

WHEREFORE, Sirius respectfully requests that this Court enter judgment in its favor and against Sachs on this Count I, and enter an order:

(a) enjoining Sachs from working in a sales role for Presidio for a period of one year from the entry of the Order granting injunctive relief, or for such other period as the Court deems appropriate to provide Sirius with the full one year period of restricted activity that Sachs agreed to provide;

(b) enjoining Sachs from having contact with his former Sirius clients for a period of one year from the entry of the Order granting injunctive relief, or for such other period as the Court deems appropriate to provide Sirius with the full one year period of restricted activity that Sachs agreed to provide;

(c) enjoining Sachs, for a period of one year from the entry of the Order granting injunctive relief, from working for Presidio in any capacity that would entail the same or substantially similar duties to those Sachs performed during the 12-month period preceding his resignation from Sirius, in the geographic territory in which he worked for Forsythe and Sirius (the Carolinas), or for such other period as the Court deems appropriate to provide Sirius with the full one year period of restricted activity that Sachs agreed to provide;

(d) enjoining Sachs, for a period of two years from the entry of the Order granting injunctive relief, from performing work for Presidio that involves the use of Confidential Information, as defined in Par. 2(b) of the Agreement, that Sachs received, obtained, or acquired during or as a consequence of his employment

with Sirius, or for such other period as the Court deems appropriate to provide Sirius with the full two year period of restricted activity that Sachs agreed to provide;

(e) enjoining Sachs, for a period of one year from the entry of the Order granting injunctive relief, from performing duties for current customers of Sirius, for whom Sachs previously performed direct services, or for such other period as the Court deems appropriate to provide Sirius with the full one year period of restricted activity that Sachs agreed to provide;

(f) enjoining Sachs, for a period of two years from the entry of the Order granting injunctive relief, from performing duties for current customers of Sirius, about which Sachs, by the nature of his duties with Sirius, possesses significant information regarding the customer's operations or relationship with the Company, or for such other period as the Court deems appropriate to provide Sirius with the full two year period of restricted activity that Sachs agreed to provide;

(g) enjoining Sachs, for a period of two years from the entry of the Order granting injunctive relief, from performing duties for prospective customers of Sirius, with which Sachs or other employees of Sirius were in business discussions or negotiations during the six months preceding his resignation, and about which Sachs possesses significant information regarding such customer's operations or proposed relationship with Sirius, or for such other period as the Court deems appropriate to provide Sirius with the full two year period of restricted activity that Sachs agreed to provide;

(h) enjoining Sachs, for a period of one year from the entry of the Order granting injunctive relief, from seeking to induce or otherwise encourage Sirius customers to modify or terminate their agreement or relationship with Sirius, or for such other period as the Court deems appropriate to provide Sirius with the full one year period of restricted activity that Sachs agreed to provide;

(i) enjoining Sachs, for a period of two years from the entry of the Order granting injunctive relief, from directly or indirectly using, communicating, disclosing or disseminating, Confidential Information as defined in Paragraph 2(b) of the Agreement, or for such other period as the Court deems appropriate to provide Sirius with the full two year period of restricted activity that Sachs agreed to provide;

(j) ordering Sachs to return to Sirius all paper and electronic materials in his possession which pertain to or were used by him in connection with his employment, including materials containing Confidential Information, and including e-mails and attachments from his personal e-mail accounts;

(k) awarding Sirius its attorney's fees and costs incurred in enforcing the Agreement;

(l)  granting Sirius any such other and further relief that the Court deems just and proper.

## COUNT II:
## VIOLATION OF THE DEFEND TRADE SECRETS ACT ("DTSA")
## 18 U.S.C. § 1836 *ET SEQ.*

128.    Sirius realleges and incorporates by reference the allegations of paragraphs 1 through 127 as if fully restated herein.

129.    Sirius' claims involve products and services used in, or intended for use in, interstate commerce.

130.    The business information that Sachs developed, and had access to, as described herein, was the subject of reasonable measures to keep such information secret.

131.    The business information that Sachs developed, and had access to, as described herein, derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

132.    The business information that Sachs developed, and had access to, as described herein, qualifies as "trade secret" information pursuant to the DTSA.

133.    Sirius is the owner of the trade secret information.

134.    Sachs has misappropriated Sirius' trade secrets by using information he developed while at Sirius for his own benefit, and by disclosing such information to Presidio, without Sirius' consent and in violation of his contractual duty to maintain its secrecy.

135.    The trade secret information Sachs has improperly used or disclosed includes, without limitation, the information Sachs disclosed to Presidio regarding "opportunities" in the

Carolinas, the estimated profitability of certain accounts, and the identities of key contacts at the accounts.

136.    On information and belief, Sachs has used and/or disclosed to Presidio trade secret information Sachs developed while he was employed by Sirius in connection with his business development efforts with the companies Sachs disclosed to Presidio in his December 8, 2019 e-mail (EX F), and the former Sachs' clients with whom representatives of Presidio have met since Sachs joined Presidio.

137.    On information and belief, Sachs has disclosed to Presidio trade secret information about Sachs' Sirius accounts including information about their needs, products and services they have purchased, profitability, decision makers, budgets and other information Sachs developed while at Sirius and under contractual obligation to keep such information confidential.

138.    Sirius is entitled to preliminary and permanent injunctive relief to prevent Sachs' actual and threatened misappropriation of Sirius' trade secret information.

139.    Sachs is using trade secret information about his Sirius customers and prospects that Sirius paid Sachs to develop and which would require Sachs to spend time and money to develop through proper means.  Sirius is therefore entitled to monetary relief in the amount of such unjust enrichment, in an amount to be proven.

140.    Sachs' trade secret misappropriation was willful and malicious, entitling Sirius to an award of its reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Sirius respectfully requests that this Court enter judgment in its favor and against Sachs on this Count II, and enter an order:

(a) enjoining Sachs on a preliminary and permanent basis from having any dealings on behalf of Presidio with respect to any of Sachs' actual or prospective Sirius accounts with respect to which Sachs has used or disclosed trade secret information;

(b) awarding Sirius monetary relief representing the amount in which Sachs has been unjustly enriched by using trade secret information he developed at Sirius instead of having to develop it through proper means;

(c) awarding Sirius its reasonable attorney's fees and costs; and

(d) granting Sirius any such other and further relief that the Court deems just and proper.

Dated: October 14, 2020                  Respectfully submitted,

**SIRIUS COMPUTER SOLUTIONS, INC.**

By:_____
           One of Its Attorneys

Heather A. Bailey, Esq. (ARDC No. 06274501)
SMITHAMUNDSEN LLC
150 N. Michigan Ave., Suite 3300
Chicago, Illinois 60601
(312) 894-3266

Jeffrey M. Glass (ARDC No. 06206976)
SMITHAMUNDSEN LLC
308 W. State Street, Ste. 320
Rockford, IL 60101
(815) 904-8804

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**SIRIUS COMPUTER**
**SOLUTIONS, INC.,**
**a Delaware Corporation,**                )
                                           )
         **Plaintiff,**                    )     **Case No. 20-cv-1432**
                                           )     **Judge Sharon Johnson Coleman**
  **v.**                               )
                                           )
**JOHN SACHS,**                            )
         **Defendant.**                   )

### VERIFICATION OF FIRST AMENDED VERIFIED COMPLAINT
### FOR INJUNCTIVE AND OTHER RELIEF

I, Justin Sobey, am the Senior Vice President and General Counsel for Sirius Computer

Solutions, Inc. Under penalties as provided by law pursuant to 28 U.S.C. § 1746, I hereby

declare and certify that the factual statements set forth in the foregoing First Amended Verified

Complaint for Injunctive and Other Relief are true and correct to the best of my knowledge,

except as to matters therein stated to be on information and belief and as to such matters the

undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: October 14, 2020

**<u>INDEX OF EXHIBITS</u>**

<u>Exhibit</u>          <u>Description</u>

A                    Non-Competition, Confidentiality and Proprietary Rights Agreement

B                    Sachs expense reports listed chronologically

C                    Sachs expense reports by customer

D                    Sachs' To-Do List

E                    Sirius/Forsythe Certificate of Merger

F                    12/8/19 e-mails from Sachs to Presidio's Byron Vick and Michael Kelly, attaching spreadsheet

G                    12/17/19 e-mail from Sachs to Presidio Associate Recruiter, Jessica Muscarella

H                    1/16/20 e-mail chain between Sachs and Tina Morettin from Checkpoint

I (Group Ex)         2/4/20 E-mail exchange between Sachs and Richard Rhodes of BCBSSC and meeting appointment for lunch

J                    Text messages between Sachs and Ron Bradley of Ingersoll Rand

## CERTIFICATE OF SERVICE

Jeffrey M. Glass, an attorney, hereby certifies that, on October 14, 2020, he caused the **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** to be filed with the Electronic Case Filing (ECF) system of the United States District Court for the Northern District of Illinois, thus accomplishing service on counsel of record for Defendant John Sachs:

Kevin M. Cloutier
Mikela Sutrina
David M. Poell
John E. Swinney
SHEPPARD MULLIN
RICHTER & HAMPTON LLP
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Telephone: (312) 499-6300
Facsimile: (312) 499-6301
kcloutier@sheppardmullin.com
msutrina@sheppardmullin.com
dpoell@sheppardmullin.com
jswinney@sheppardmullin.com

Robert S. Friedman
SHEPPARD MULLIN
RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 499-6300
Facsimile: (212) 499-6301
rfriedman@sheppardmullin.com

By:_____
One of the Attorneys for
Sirius Computer Solutions, Inc.

Heather A. Bailey (ARDC No. 06274501)
SMITHAMUNDSEN, LLC
150 N. Michigan Ave., Suite 3300
Chicago, Illinois 60601
(312) 894-3266
hbailey@salawus.com

Jeffrey M. Glass (ARDC No. 06206976)
SMITHAMUNDSEN, LLC
308 W. State Street, Ste. 320
Rockford, IL 60101
(815) 904-8804
jglass@salawus.com